## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | |
|---|---|
| LAUREN PARADISE, | ) |
| Plaintiff, | ) |
| vs. | ) Case No.: |
| | ) JURY DEMAND |
| BROWN UNIVERSITY, | ) |
| Defendant. | ) |

## VERIFIED COMPLAINT AND JURY DEMAND

Plaintiff Lauren Paradise is a student at Brown University suffering severe anxiety and depression as a result of the COVID-19 pandemic. Without any outreach from Brown, an advisor, or acknowledgement of her disability, she now finds herself suspended pending readmission next fall for "schedule hopping" her twice-weekly COVID tests. Ms. Paradise alleges as follows:

### PARTIES

1. The Plaintiff is Lauren Paradise ("Ms. Paradise"), a domiciliary of Portland, Maine. During the events described herein, Ms. Paradise was a student at Brown University and resided off campus in Providence, Rhode Island.

2. The Defendant is Brown University ("Brown"), a Rhode Island non-profit corporation with a principal place of operation in Providence, Rhode Island.

**JURISDICTION & VENUE**

3. Subject matter jurisdiction exists in this Court pursuant to 28 U.S.C. § 1331 because Ms. Paradise's claims predominantly arise under Title III of the *Americans with Disabilities Act* and Section 504 of the *Rehabilitation Act of 1973*.

4. Diversity jurisdiction exists pursuant to 28 U.S.C. § 1332 because Ms. Paradise and Brown are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of costs and interest.

5. Supplemental jurisdiction exists pursuant to 28 U.S.C. § 1367(a) as all of Ms. Paradise's claims arise from the same controversy.

6. Personal jurisdiction exists in this Court over Brown as Brown is a citizen of Rhode Island.

7. Venue properly lies in this district pursuant to 28 U.S.C. § 1391 because the events, acts and omissions giving rise to the claims herein occurred primarily in this judicial district.

**FACTUAL BACKGROUND**

8. Ms. Paradise is a second-year student at Brown studying anthropological archeology and Hispanic literatures and culture.

9. In March 2020 of Ms. Paradise's freshman year, health authorities detected the arrival of the COVID-19 virus in Rhode Island and classes at Brown went fully remote.

10. For the final two months of her freshman year, Ms. Paradise continued her studies from her parents' home in Portland, Maine.

11. Studying at home was difficult for Ms. Paradise due to the isolation and her mother's health. Ms. Paradise's mother, Kathi Paradise, suffered a massive stroke in 2017 and is still recovering. Her struggles are difficult for Ms. Paradise to see. Between this and the isolation, Ms. Paradise fell into anxiety and depression.

12. Eager to return to Providence, Ms. Paradise located an opportunity. Her Anthropology professor recommended her for an internship related to her field of study that would last her entire college career but required Ms. Paradise's presence in Providence.

13. Ms. Paradise's father, Jon, found the internship idea attractive because, aside from alleviating his daughter's mental distress, he needed her to be able to work and assist with tuition. However, work was not possible if Ms. Paradise remained at home in Portland because Kathi's poor health made her a high risk should she contract the COVID-19 virus. Consequently, Jon and Kathi agreed that their daughter would return to Providence beginning in the summer.

14. In June of 2020, Ms. Paradise returned to Providence, where she found a sublet sharing an off-campus apartment with two Brown students.

15. Unfortunately, the start date for Ms. Paradise's internship was repeatedly delayed on account of the growing pandemic. Meanwhile, she took a job decorating cakes.

16. Through the summer of 2020, Ms. Paradise managed her mental health well through mindfulness exercises, an anxiety workbook, and hope that she would soon again be among friends and immersed in her studies.

17. As summer came to an end, Ms. Paradise's hopes of a return to normal were dashed. On August 11, 2020, Brown announced that all undergraduate classes would be taught remotely until at least Oct. 5, 2020. Consequently, none of Ms. Paradise's friends returned to Providence.

18. On August 31, 2020, Ms. Paradise moved to another sublet in Providence with three medical students.

19. Ms. Paradise, at 19 years of age, found herself completely alone amidst the pandemic, far from friends and family, and fighting depressive tendencies.

20. In consideration of students' "return to Brown University to live in a residence hall and/or access resources on campus," Brown required students to agree to twelve "commitments."

21. Commitment no. 5 obliged students to undergo "required testing for COVID-19." For undergraduates, this was twice per week, though the frequency is not set forth in any policy adopted by the president or posted to the official university policy web site.

22. Not living on campus or attending any classes on campus, Ms. Paradise did not initially sign the commitments or register for the twice-weekly COVID-19 testing.

23. On Sept. 29, 2020, Brown placed Ms. Paradise on probation for failure to comply and misrepresentation of her remote status.

24. According to Dean Yolanda Castillo-Appollonio, "remote study is considered to be outside of the 30 mile radius from the University." This definition of remote study is not set forth in any policy adopted by the president or posted to the official university policy web site.

25. Throughout October, Ms. Paradise's depression worsened. Wallowing away in her room, she was barely able to find the energy to get out of bed to feed herself. Simple tasks like brushing teeth had become physically and emotionally draining. She had no "pod" of friends. She was alone, saw no one, and went nowhere.

26. Ms. Paradise became so depressed that all she could do was sleep and evaluate which campus building would be the most effective to jump off of. She mixed up her days and nights, and would wake up in a panic after missing a class or COVID testing appointment.

27. On Oct. 15, 2020, Jon Paradise wrote Deans Love Wallace and Castillo-Appollonio:

> Lauren has become VERY depressed . . . Ms. Wallace - I know Lauren told you on the phone that the pandemic has had a tremendous emotional impact on her mental health . . . Ms. Castillo-Appollonio - On our call with you, this was our concern. We can't tell you how upset we are that, with all that is going on, Brown has fed this confusion (with the mixed communications and uncertainty), and is adding to the stress and mental health issues for our daughter and, likely, other students.

28. During this period, Ms. Paradise began missing not only COVID tests, which were a 20-minute walk across campus, but also Zoom meetings for class which she could attend from her own room.

29. Subsequently, Ms. Paradise became emotional and broke into tears while reciting Chaucer to her English professor. Concerned, the professor contacted Dean Cynthia Ellis of Student Support Services.

30. On Oct. 21, 2020, Dean Ellis emailed Ms. Paradise:

> I am reaching out to you this afternoon after it came to my attention that there is some concern for your wellbeing.

31. Ms. Paradise and Dean Ellis spoke of Ms. Paradise's depression, anxiety and difficulties attending class, and Dean Ellis, in turn, gave Ms. Paradise a dean's note for academic accommodations which advised her professors, "One of your students, Lauren Paradise, is managing a difficult health related condition which has been affecting her academics."

32. The Dean's note helped with Ms. Paradise's academic struggles, but did not address her trouble getting to her COVID testing.

33. Between Oct. 15 and 23, Brown sent Ms. Paradise three first reminders and one second reminder to complete her twice-weekly COVID testing. Then, roughly at the same time she began receiving academic accommodations, all reminders stopped for the next four weeks.

34. The next reminder arrived on Nov. 24, the week of Thanksgiving Break. Ms. Paradise, however, did not go home or even get out of bed or call family.

35. The following week, on Dec. 4, 2020, Ms. Paradise received an email from Dean Kirsten Wolfe, who wrote, "I need to meet with you to discuss the University's response to your COVID-19 testing compliance."

36. Ms. Paradise responded right away and set up a meeting.

37. Later the same day, Jon Paradise wrote Dean Wolfe:

> Lauren is in a very fragile mental state, and can't get out of bed some days this semester. She has been seeing Dean Ellis, who is very aware of Lauren's issues with depression and despair this semester . . . further complicating Lauren's mental state, is my wife's health. She had a major stroke 3 years ago and, although functioning, has significant health challenges which has been hard for Lauren to see and deal with. This is why Lauren could not live at home . . . .

38. Ms. Paradise's meeting with Dean Wolfe took place on Dec. 7, 2020. At the meeting, Ms. Paradise expected a discussion regarding her struggles. Instead, she immediately received a document advising her that she was being charged with violations of code sections D8 (Failure to Comply), D10 (Harm to Persons), and D24 (Violation of Operational Rules), and that there would be an administrative hearing. If found responsible, she could be given probation or even suspension.

39. Upon receiving this news, Ms. Paradise began to have a panic attack and tried to get off of the telephone as soon as possible. She then cried alone in her room until she passed out.

40. Also on Dec. 7, 2020, in response to an email from Jon Paradise concerning Lauren's wellbeing, Dean Ellis wrote:

> if you have any concerns about Lauren's safety please know there are several resources. She can call CAPS after hours (401-863-3476) at any time to have a conversation with a counselor. If you are concerned she may harm herself tonight you can certainly call DPS at 401-863-3322 and ask for a wellness check. They will bring EMS with them and may call CAPS for consultation when they are there if they have any concerns about her safety.

41. If there were any doubt that Brown knew Ms. Paradise was suffering from a disability and required accommodations, Jon Paradise dispelled it on Dec. 8, 2020, when he wrote Dean Wolfe concerning his daughter's depression:

> Should we submit statements providing context as we firmly believe that this is a disability and needs reasonable accommodations?

42. Ms. Paradise's administrative hearing took place via Zoom on December 18, 2020.

43. Ms. Paradise explained to the hearing officer that she is suffering from immobilizing depression and that this was making it difficult for her to get out of bed and to the testing sites. However, of those assembled for the hearing, not one posed a single question about Ms. Paradise's depression, how it affected her ability to get to COVID testing, or what accommodations might help her comply.

44. Ms. Paradise explained that when she missed a testing appointment, she always rescheduled immediately. Dean Joshua Gonzalez, however, stated his view that this constituted "schedule hopping" and was a violation of Brown's COVID policy because it resulted in a lengthening of the time between tests.

45. Following the hearing, Ms. Paradise was found responsible for violations of code sections D8 (Failure to Comply), D10 (Harm to Persons), and D24 (Violation of Operational Rules), and suspended pending an application for readmission for the Fall of 2021.

46. Ms. Paradise appealed the decision, but on February 1, 2021, Koren Bakkegard, Brown's Associate Vice President for Campus Life and Dean of Students, denied the appeal.

## COUNT 1
*Discrimination*

47. Brown is a private, non-religious, post-secondary education institution, and therefore subject to Title III of the *Americans with Disabilities Act*.

48. Undergraduate tuition and fees at Brown for the academic year 2020/2021 are $60,696.

49. Average room and board at Brown for the academic year 2020/2021 is $15,908.

50. Forty-four percent of Brown students receive need-based financial assistance.

51. The forms of financial assistance accepted at Brown include federal Pell Grants, Supplemental Educational Opportunity Grants, the federal Direct Loan and Perkins loans. Therefore, Brown is subject to Section 504 of the *Rehabilitation Act of 1973*.

52. Brown received $2,421,116 from the Department of Education pursuant to Brown's Certification and Agreement for Emergency Financial Aid Grants to Students, among other federal funds for research and programs in which Brown participates. Therefore, Brown is subject to Section 504 of the *Rehabilitation Act of 1973*.

53. Ms. Paradise suffers from severe depression and anxiety.

54. Ms. Paradise's depression and anxiety substantially limit her ability to eat, sleep, and leave her living quarters.

55. Eating, sleeping, and leaving home are major life activities; therefore, Ms. Paradise's depression and anxiety constitute an actual disability under Title III of the *Americans with Disabilities Act* and Section 504 of the *Rehabilitation Act of 1973*.

56. Ms. Paradise disclosed her disability to Brown in October of 2020.

57. Jon Paradise advised Brown on Dec. 8, 2020, "we firmly believe that this is a disability and needs reasonable accommodations."

58. Ms. Paradise reminded Brown of her disability at her Administrative Hearing in December of 2020 and explained that it impaired her ability to comply with Brown's COVID testing regime.

59. Brown sought neither to confirm Ms. Paradise's disability nor to engage her in any interactive process to determine if a reasonable accommodation were possible.

60. Brown's suspension of Ms. Paradise in lieu of engaging in the interactive process after receiving notice of her disability and a request for accommodation constitutes discrimination on the basis of Ms. Paradise's disability.

WHEREFORE, Plaintiff Lauren Paradise requests, pursuant to 28 CFR § 36.501, that the Court restrain and enjoin Defendant Brown University from denying her the opportunities afforded its students, including *inter alia*, class attendance and participation, university housing,

and dining privileges, and that pursuant to 28 CFR § 36.505, the Court award her her attorneys' fees and costs in bringing this action.

## COUNT 2
*Breach of Contract*

61. Ms. Paradise re-avers paragraphs 1-60 as if fully set forth in this count.

62. As part of its admissions packet, Brown provided Ms. Paradise with copies of its school policies, including the *2019-2020 Code of Student Conduct* and *Student Conduct Procedures*. Upon information and belief, the relevant portions of these documents remained unchanged for academic year 2020-2021.

63. For academic year 2020-2021, Brown also adopted the *COVID-19 Student Conduct Procedures*.

64. As a member of the Brown community, Ms. Paradise's rights under the various school codes and policies are contractual in nature.

65. According to the *COVID-19 Student Conduct Procedures* and Dean Gonzalez, who explained them at Ms. Paradise's hearing, when a student misses a COVID test, there are supposed to be a series of steps involving "educational interventions" before the violation would get to a disciplinary stage.

66. Contrary to the *COVID-19 Student Conduct Procedures,* Ms. Paradise received no educational intervention or warning that disciplinary procedures were the next step. This oversight constitutes a breach of Ms. Paradise's contractual rights.

67. According to the general *Student Conduct Procedures*, when a student is charged with violations of the Code, he or she is entitled to, *inter alia*, the right to "have an advisor during a formal Investigative Review, a hearing before the Student Conduct Board, an Administrative Hearing, or a Restorative Board" and "have a reasonable length of time to prepare . . . ." Brown denied Ms. Paradise both of these rights.

68. Initially, Brown told Jon Paradise that he could be his daughter's advisor. On Dec. 11, 2020, Dean Wolfe again acknowledged his "role advising her [Ms. Paradise]." However, just two days before Ms. Paradise's hearing, Brown informed Ms. Paradise that her father would not be allowed to be her advisor at the hearing.

69. Because Brown did not inform Ms. Paradise that her father could not be her advisor until the week of finals and two days before the hearing, there was no time for Ms. Paradise to either find another trusted, available advisor or familiarize such a person with her condition and situation. This violated her contractual right to "a reasonable length of time to prepare."

70. Because of the late reversal regarding Jon Paradise serving as advisor, Ms. Paradise had no advisor for the most important part of her administrative hearing process - the actual hearing. This violated her contractual right to "an advisor during a formal Investigative Review, a hearing before the Student Conduct Board, an Administrative Hearing, or a Restorative Board."

71. Ms. Paradise's lack of an advisor adversely impacted her administrative hearing. Due to her anxiety, Ms. Paradise's voice was quivering throughout the hearing and her participation was minimal.

72. At one point during the hearing, Dean Wolfe asked Ms. Paradise a question. Ms. Paradise had not even responded when Dean Wolfe replied something along the lines of "I'll take that as a no."

73. Later in the hearing, after Dean Gonzalez finished his presentation against Ms. Paradise, Dean Wolfe told Ms. Paradise that it was her turn to offer testimony in her defense, but suggested that they could just skip to questions. Tired, anxious and weak, and with no one to urge her on, Ms. Paradise responded that skipping to questions would be fine and failed to actively defend herself. Unsurprisingly, the questions focused on bolstering Brown's case

against Ms. Paradise rather than exploring her mental state. Thus, the violation of Ms. Paradise's right to an advisor had adverse consequences.

74. Also impacting Ms. Paradise's right to "a reasonable length of time to prepare" is the timeframe chosen by Brown for her hearing. The hearing was scheduled during finals week.

75. The initial meeting between Ms. Paradise and Dean Wolfe was Monday, Dec. 7, 2020, the day before finals week started. Ms. Paradise had an exam on Wednesday, a presentation on Friday, and two papers due that weekend. Also amidst the crush of finals, Brown gave Ms., Paradise less than 72 hours to submit witness testimony and relevant documents. Ms. Paradise already did not feel like she could make it through finals week, and now she had to do so while preparing for an administrative hearing. This timing was unfair and did not respect Ms. Paradise's right to "a reasonable length of time to prepare," given the academic week chosen for her hearing.

76. In finding Ms. Paradise responsible for violations D.8 (Failure to Comply), D.10 (Harm to Persons), and D2.4 (Violation of Operational Rules), Brown applied the Code in an arbitrary and unreasonable manner.

77. Violations D.8 and D.24 were based on Ms. Paradise's obligation to test twice per week, and at least for a period of time in October, she received the reminders required by the *COVID-19 Student Conduct Procedures* to reschedule testing appointments. Yet, when Ms. Paradise rescheduled, Brown accused her of violation D.10 by risking harm to the two people manning the testing center.

78. In effect, the hearing officer reached the absurd conclusion that Brown could require an action for which it could then impose discipline. In other words, if Ms. Paradise missed a scheduled appointment, it is a policy violation unless rescheduled. Yet, if Ms. Paradise appeared for the rescheduled appointment, she supposedly placed the attendants in danger, which is also a

violation. This application of the *Code of Student Conduct* would not match any student's reasonable expectation.

79. In addition to the foregoing, Brown has disciplined Ms. Paradise for violations of rules not set forth in any policy adopted by the president and posted to the official university policy website, including but not limited to the rule requiring undergraduates to test twice per week rather than once per week, and Dean Castillo-Appollonio's rule that anyone living within 30 miles of campus must be considered to be on-campus.

80. Brown's suspension of Ms. Paradise will deny her the opportunities afforded its students, including *inter alia*, class attendance and participation, university housing, and dining privileges, in contravention of established procedures and protections, the guarantees of due process and fundamental fairness, and the implied covenant of good faith and fair dealing.

81. As a direct and foreseeable consequence of these breaches, Ms. Paradise has sustained damages.

82. Despite having already invested over $150,000 in a Brown University education, Ms. Paradise is now banned from campus and her undergraduate degree is at risk.

WHEREFORE, Plaintiff Lauren Paradise requests that the Court award her damages for breach of contract in an amount exceeding $75,000, to be proven at trial.

### COUNT 3
*Injunctive Relief*

83. Ms. Paradise re-avers paragraphs 1-82 as if fully set forth in this count.

84. Brown's decision to suspend Ms. Paradise is in violation of her procedural and substantive contractual rights and reasonable expectations.

85. Brown's decision to suspend Ms. Paradise is capricious and arbitrary.

86. As a direct and proximate result of the foregoing breach, Ms. Paradise faces imminent irreparable harm to her education and professional career goals, as well as emotional harm for which no adequate legal remedy exists.

WHEREFORE, Plaintiff Lauren Paradise requests that the Court restrain and enjoin Defendant Brown University from proceeding with her suspension unless and until it provides her with all rights guaranteed to Brown students under the *Code of Student Conduct, Student Conduct Procedures, COVID-19 Student Conduct Procedures* and all other codes and policies applicable to her condition and circumstance.

## JURY DEMAND

Plaintiff Lauren Paradise demands a trial by jury on all issues so triable.

## VERIFICATION

The undersigned hereby swears under pains and penalties of perjury that the facts stated herein are true and accurate to the best of her knowledge, or that, as to facts stated on information and belief, that she believes such facts to be true.

_____
Lauren Paradise

Subscribed and sworn to before me in Providence, Rhode Island, on February 2, 2021.

**ELLEN TAYLOR**
**NOTARY PUBLIC - State of Rhode Island**
**My Commission Expires**
**March 1, 2022**

_____
Notary Public
My Commission Expires: 3/1/2022

Dated: February 2, 2021          The Plaintiff, Lauren Paradise,
                                 By her Attorney,

                                 /s/ J. Richard Ratcliffe
                                 J. Richard Ratcliffe, #2603
                                 Ratcliffe Harten Galamaga LLP
                                 40 Westminster Street, Suite 700
                                 Providence, RI 02903
                                 Tel: (401) 331-3400
                                 Fax: (401) 331-3440
                                 rratcliffe@rhgllp.com